**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Martell M. Box (M47671),<br><br>Plaintiff,<br><br>v.<br><br>Justin Wilks, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 23 C 2776<br><br>Hon. Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

In this *pro se* civil rights lawsuit brought pursuant to 42 U.S.C. § 1983, Plaintiff Martell M. Box alleges that Defendants Justin Wilks and Michael Remmers violated his constitutional rights during his incarceration at Dixon Correctional Center. Before the Court is Defendants' motion for summary judgment, to which Plaintiff has responded. For the reasons discussed below, the Court grants Defendants' motion.

**I. Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material facts exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at

248). A fact is material if it might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992).

The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carrol v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door Cty Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

The Court's role is "to determine whether there is a genuine issue for trial," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citations and quotations marks omitted), without "weigh[ing] evidence, mak[ing] credibility determinations, resolv[ing] factual disputes and swearing contests, or decid[ing] which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Thus, in making that determination, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

**II. Northern District of Illinois Local Rule 56.1**

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted.)

Local Rule 56.1(a) requires the moving party to provide "a statement of material facts" as to which the moving party contends there is no genuine issue for trial. LR 56.1(a); Fed. R. Civ. P. 56(1). The opposing party must then "file a response to each numbered paragraph in the moving party's statement" of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005) (internal quotation marks omitted); LR 56.1(b), (e). In the case of any disagreement, the opposing party must reference "specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id*. The nonmoving party may also present a separate statement of additional facts that require the denial of summary judgment that consists of "concise numbered paragraphs" "supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(b)(3), (d).

In this case, Defendants filed a LR 56.1 statement of material facts (Dkt. 81-2) and memorandum of law (Dkt. 81-3) with their motion for summary judgment (Dkt. 81). Consistent with the local rules, Defendants also provided Plaintiff with a LR 56.2 Notice (Dkt. 81-1), which explains what LR 56.1 requires of a *pro se* litigant opposing summary judgment.

For his part, Plaintiff submitted a response to Defendants' statement of facts (Dkt. 93), a Declaration (Dkt. 94), a statement of additional facts (Dkt. 95), and a memorandum of law (Dkt. 96).[1]

[1] The Court observes that Plaintiff filed his original response to Defendants' summary judgment motion back in February 2026. (Dkt. 86.) Months later, and after Defendants had filed their reply (*see* Dkt. 88), Plaintiff sought leave

The Court has construed Plaintiff's *pro se* submissions liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), despite the fact that they do not fully meet the requirements of this Court's Local Rules.[2] The Court nevertheless accepts Defendants' version of the facts where that version is supported by evidence and not properly controverted in Plaintiff's submissions. The Court similarly accepts Plaintiff's additional facts to the extent those facts are supported by the record or where Plaintiff could properly testify about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); *see also* Fed. R. Evid. 602. The facts are, thus, presented as favorably to Plaintiff as the record and LR 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

## III. Background

### A. Procedural History

In this lawsuit, Plaintiff challenges certain disciplinary action that was taken against him in June 2021, when a person named Latrisha Box sent mail addressed to Plaintiff, which contained paper soaked in synthetic cannabinoids. The mail was intercepted by correctional staff in the mailroom at Dixon Correctional Center, where Plaintiff was incarcerated at that time. Plaintiff was placed in restrictive housing on investigative status and, later, was issued a disciplinary ticket

and was granted permission to file a "corrected" response to Defendants' summary judgment motion. (*See* Dkts. 91, 100.) Plaintiff submitted his "corrected" filings (Dkts. 92-96) in June 2026, and Defendants have replied to those filings (Dkts. 107, 108).

[2] The Court observes that, in his response, Plaintiff disputes just two of Defendants' thirty-six facts (nos. 11 and 29). (*See* Dkt. 93.) With respect to Defendants' factual statement at no. 29, Plaintiff indicates that he disputes it but he does not seem to challenge the fact itself. Regardless though, both of the facts that Plaintiff purports to dispute -- no. 11 and no. 29 -- are immaterial to the Court's due process analysis (as discussed in more detail below). Further, while Plaintiff submits a stand-alone document captioned as a statement of additional facts, this document does not serve to add any new facts. Rather, the document mirrors/registers the same two "factual" disputes identified above (with respect to Defendants' factual statements at nos. 11 and 29), and the third (and only) remaining additional fact identified in this stand-alone document is a legal conclusion (not a properly-supported factual statement). (*See* Dkt. 95.). As an additional matter, the Court points out that Plaintiff's Declaration attempts to introduce new facts. (*See* Dkt. 94.)

for drugs and drug paraphernalia. Subsequently, a disciplinary hearing was conducted and Plaintiff was found guilty of a reduced charge, for which he spent time in segregation. (*See* Dkt. 15, Plaintiff's Amended Complaint at pgs. 4-7.)

By order dated July 2, 2024, the Court found that Plaintiff's allegations sufficiently stated a procedural due process claim against Defendants Wilks and Remmers. (*See* Dkt. 22, 07/02/24 initial screening order at pgs. 3-4.) At that time, the Court dismissed all other claims and Defendants. (*See id.*)

### B. Undisputed Facts

Martell Box ("Box" or "Plaintiff") was an individual in custody at Dixon Correctional Facility ("Dixon") during the period relevant to the allegations in his amended complaint. (Dkt. 81-2, Defendants' Statement of Facts, ¶ 1.) Justin Wilks ("Wilks") was the Warden at Dixon during the time relevant to Plaintiff's amended complaint, and was not present at Plaintiff's July 8, 2021 disciplinary hearing. (*Id.* at ¶¶ 2, 3.) Michael Remmers ("Remmers") was the Adjustment Committee Chair at Dixon during the time period relevant to Plaintiff's amended complaint, and was present during Plaintiff's July 8, 2021 disciplinary hearing. (*Id.* at ¶ 4.)

#### Events Leading up to/Surrounding the June 15, 2021, Mail Incident

On June 15, 2021, at approximately 9:20 am, a piece of mail addressed to Plaintiff was delivered to Dixon. (*Id.* at ¶ 5.) The mail was processed and searched by Correctional Officer Rodriguez in the mail room. (*Id.*) The mail had a strong odor and appeared to possibly be wet. (*Id.*) Correctional Officer Rodriguez immediately took the envelope to Internal Affairs Lieutenant Manzano. (*Id.*) The mail was sent by Latrisha Box. (*Id.*) It constituted an informal correspondence describing and containing an apparent draft of a fiction story, with references to

marijuana. (*Id.*) It further stated, "[l]ove you baby and the kids love you too." (*Id.* at ¶ 6.) The Internal Affairs department utilized a Narcotics Analysis Reagent Kit II (NARK II) on a stained portion of the mail, which indicated a presumptive positive for synthetic cannabinoids (K2). (*Id.* at ¶ 7.)

On June 15, 2021, Box was placed in mechanical restraints and was escorted to building 130, restrictive housing, where he was placed on investigative status in cell 3. (*Id.*) Internal Affairs Lieutenant Manzano requested extra staff, as well as the Emergency Response Team, to search housing unit 31/cell 5 where Box had resided, which was a four-man cell, occupied by three other inmates. (*Id.* at ¶ 8.) During a period of investigative status, an individual may be placed in segregation to allow Internal Affairs to investigate a rule violation, which may implicate the safety and security of the facility.[3] (*Id.* at ¶ 9.)

Internal Affairs conducted an investigation, including interviews on June 15, 2021, with Plaintiff in restrictive housing, as well as the other inmates that resided in Plaintiff's cell. (*Id.* at ¶ 11.) All of Box's property was sent to the Internal Affairs Office to be searched. (*Id.*) Internal Affairs staff continued to conduct interviews and monitor phone calls, as well as incoming mail.

---

[3] Defendants provide the Illinois Department of Corrections (IDOC) policy concerning segregation, which is set forth at DR 504 and establishes departmental policy for placement of inmates in confinement status and establishes standards for living conditions in the Confinement and Segregation Unit. (Dkt. 81-2 at ¶ 10.) The policy provides that an inmate may be placed in segregation for a variety of reasons. (*Id.*) He may be confined there for a specified period of time by the Adjustment Committee when found guilty of an offense. (*Id.*) He may be confined in segregation pending the disposition of a disciplinary report when it is a serious offense and the Warden determines that for the safety and security of the institution the inmate should be removed from the general population. (*Id.*) If this occurs, the report will be heard by the Adjustment Committee within fourteen (14) days. (*Id.*) He may also be confined in segregation while an investigation is being conducted. (*Id.*) This investigation may be ordered by the Adjustment Committee and must be completed within 30 days (extensions to this time limit may be granted only in an emergency). (*Id.*) While confined pending a hearing or an investigation, inmates must adhere to segregation procedures. (*Id.*) If found guilty, time spent in this status counts toward any sentence to segregation. (*Id.*) If found not guilty, he will be restored to his previous assignment and housing unit, if possible, and receive appropriate state pay. (*Id.*) Only segregation inmates who are not C grade status shall be permitted to make one collect phone call per month for a period of no more than 15 minutes. (*Id.*) A copy of DR 504, which explains all restrictions and procedures which apply to those confined to segregation, is available in the library and on the Segregation Unit. (*Id.*)

(*Id.*)

An interview with Plaintiff was attempted, but Plaintiff refused to answer any questions pertaining to the investigation.[4] (*Id.*) The investigation was conducted at the request of Wilks, after receiving information that Plaintiff was sent a suspicious package that was discovered by the Dixon mail room. (*Id.* at ¶ 12.)

***The July 8, 2021, Disciplinary Report***

On July 8, 2021, Plaintiff was served a Disciplinary Report, which noted that an investigation was initiated on June 15, 2021, and concluded on July 8, 2021. (*Id.* at ¶ 13.) The report identified Plaintiff's alleged violation as "DR504:203 – Drugs and Drug Paraphernalia" and stated that:

> [o]n 6/15/21 Officer Rodriguez #9958 forwarded a letter to the Internal Affairs department that was sent into the institution and addressed to Martell Box M-47671. The letter was visibly stained and had a strong odor emitting from the envelope. Th[e] reporting officer utilized a Narcotics Analysis Reagent Kit II on a portion of the mail and the test indicated a presumptive positive for synthetic cannabinoids. Box was identified using Institutional Graphics.

(*Id.*)

The Disciplinary Report further indicated that the alleged violation of "DR504:203 – Drugs and Drug Paraphernalia" was a "major infraction, submitted for hearing investigator, if necessary, and to Adjustment Committee." (*Id.*) The bottom portion of the Disciplinary Report indicated that Plaintiff had the "right to appear and present a written or oral statement or explanation concerning the charges. [Plaintiff] may present relevant physical material such as records or documents." (*Id.*) It also indicated that Plaintiff:

> may ask that witnesses be interviewed and, if necessary and relevant, they may be

[4] As noted above, Plaintiff purports to dispute this fact (*see* Dkt. 93 at pg. 1), although it is immaterial to the due process claim at issue in this suit.

> called to testify during your hearing. [Plaintiff] may ask that witnesses be questioned along lines you suggest. [Plaintiff] must indicate in advance of the hearing the witnesses [Plaintiff] wish[es] to have interviewed and specify what they could testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee. [Plaintiff] may have staff assistance if [Plaintiff is] unable to prepare a defense. [Plaintiff] may request a reasonable extension of time to prepare for [his] hearing.

(*Id.*)

> "DR 203 – Drugs and Drug Paraphernalia" is defined as follows:
>
> Possessing, manufacturing, introducing, selling, supplying to others, or receiving alcohol, any intoxicant, inhalant, narcotic, syringe, needle, unauthorized controlled medication, controlled substance, unidentifiable medication or marijuana; or being under the influence of any of the above substances; or refusing to be tested for drug or alcohol use, including failure to provide a specimen within two hours after the request; or destroying or tampering with drug or alcohol tests or testing equipment.

(*Id.* at ¶ 14.)

> "DR 203 – Drugs and Drug Paraphernalia" carries the following maximum penalties:
>
> Loss or Restriction of Privileges: 6 months
> B or C Grade: 6 months
> Sentence Credit Revocation: 6 months
> Segregation: 6 months.

(*Id.* at ¶ 15.)

The bottom portion of the Disciplinary Report provides space for an inmate to request that the Adjustment Committee or Program Unit consider calling the particular witnesses regarding the Disciplinary Report, and instructed Plaintiff to detach and return the provided space to the Adjustment Committee or Program Unit Prior to the hearing. (*Id.* at ¶ 16.) Plaintiff left this bottom portion of the Disciplinary Report blank, and refused to sign it. (*Id.*)

Plaintiff had no witnesses to present and did not request to present any witnesses. (*Id.* at ¶ 17.) Plaintiff testified that he prepared a statement in advance of the hearing, which stated that he

had no knowledge of the envelope in question, that he did not request it, and that he denied any wrongdoing. (*Id.* at ¶ 18.)

***The July 13, 2021, Adjustment Committee Hearing***

On July 13, 2021, Plaintiff attended his Adjustment Committee Hearing. (*Id.* at ¶ 19.) At the Adjustment Committee hearing, Plaintiff presented a written statement and pled not guilty, but did not speak or give an additional statement. (*Id.* at ¶ 21.) Plaintiff testified that the hearing was conducted at his "segregation cell[.]" (Dkt. 81-6, Plaintiff's deposition at 65:15-17.)

The Adjustment Committee Final Summary Report describes the hearing proceedings, basis for decision, and final result as follows:

> Offense: Final Result: 203. Violation: Drugs & Drug Paraphernalia; Reduced to 601.203 Attempt.[5] Comments: letter with positive test cannabinoids.
>
> Final Result: Guilty
>
> Witness Type: No Witness Requested.
>
> Record of Proceedings: Report was read. Box M47671 stated that he had no knowledge of any drugs being sent into him at Dixon CC. Box submitted a written statement.
>
> Basis for Decision: Committee finds Box M47671 guilty of reduced form (attempt) of the 203 as charged. Decision was reached based on the following factors. Disciplinary Report from Officer Allen Internal Affairs stating that Box M47671 was observed receiving a letter addressed to Martel Box M47671 through Dixon CC Institutional mail. The letter was visibly stained and had a strong odor emitting from the envelope. Staff utilized a Narcotics Analysis Reagent Kit II on a portion of the incoming mail which yielded a presumptive positive result for the presence of synthetic cannabinoids. Committee review of the referenced testing results provided by Internal Affairs showing and confirming the positive test result. Committee review of envelope which was observed to be addressed to Martell Box

[5] DR 601 is defined as follows: Aiding and abetting any person in the commission of any of these offenses; attempting to commit any of these offenses; making plans to commit any of these offenses; soliciting another to commit any of these offenses; or conspiring to commit any of these offenses shall be considered the same as the commission of the offense itself and shall carry the penalty prescribed for the underlying offense. The underlying offense must be specified in the disciplinary report. (Dkt. 81-2 at ¶ 22.)

> M47671. Reporting staff's positive ID of Box M47671 using Institutional Graphics database.
>
> Disciplinary Action Recommended
> 45 Days Segregation
> Transfer (Disciplinary)
> 3 Months Commissary Restriction
> 6 Months Contact Visits Restriction
> Basis for Discipline: Nature of offense.
>
> Final
> 45 Days Segregation
> Transfer (Disciplinary)
> 3 Months Commissary Restriction
> 6 Months Contact Visits Restriction.

(Dkt. 81-2 at ¶ 19.)

The Adjustment Committee Final Summary Report further indicated that Plaintiff "has the right to appeal an adverse decision through the grievance procedure established by Department Rule 504: subpart F." (*Id.* at ¶ 20.)

***Plaintiff's Time in Segregation (June 15, 2021, to July 30, 2021)***

Plaintiff was housed in a segregation cell from June 15, 2021, until July 30, 2021, totaling 45 days. (*Id.* at ¶ 27.)

At his deposition, Plaintiff was asked, "what is the difference between investigative status and segregation?" (Dkt. 81-6 at pg. 75:21-22.) In response, Plaintiff stated as follows:

> I guess it depend on individual situations because this [*sic*] they not consistent with. Like I say, in my situation when I was placed back there by Internal Affairs, I wasn't allowed no property or none of that stuff because of I guess the – I guess the – I guess the seriousness of whatever they was investigating.
>
> So they didn't – they didn't want to allow me none of my paperwork or nothing because they wanted to test everything thinking they was gonna catch me with drugs, so I wasn't allowed nothing.
>
> But in investigative status, according to the AD, you supposed to be allowed all

> your property because you not – you not – you not found guilty or nothing. You just pending whatever the investigative status is versus when you in seg, then you're allowed whatever seg allows – they allow for you to have while you doing seg time, which is normally publications, your legal stuff and, like, personal hygiene. I mean, cosmetics and stuff. So that's basically it.

(*Id.* at pg. 76:1-22.) Defense counsel then asked: "[a]nd you didn't have any of those while you were in investigative status?" (*Id.* at pg. 76:23-24.) In response, Plaintiff stated, "no." (*Id.* at pg. 77:1.) Defense counsel then asked, "[b]ut you think it's probably because of the nature of what they were allegedly investigating?" (*Id.* at pg. 77:2-4.) In response, Plaintiff answered "[y]es." (*Id.* at pg. 77:5.)

During his deposition, defense counsel also asked Plaintiff to "walk through the discipline" he received following his disciplinary hearing. (*Id.* at pg. 77:6.)

Plaintiff testified he received three months commissary restriction, which is "when they restrict what you allowed to go over there and purchase, and it's normally they – whenever you're on commissary restriction you only allowed to purchase cosmetics. You not allowed to buy no food and things like that." (*Id.* at pg. 77:13-18.) Plaintiff testified further that "you still able to get your meals through dietary[.]" (*Id.* at pg. 77:24; 78:1.) Plaintiff testified that while he was in investigative status and "in seg," he received "chow[.]" (*Id.* at pg. 78:4-9.)

Plaintiff testified that he also received six months contact visit restrictions, which "is when they restrict your contact with your visits." (*Id.* at pg. 78:14-16.) Plaintiff testified that he "actually went on visits while [he] was back there in seg for this, and [he] was actually – I actually had to – [his] family actually had to sit behind a glass, and [he] was shackled up to the desk[.]" (*Id.* at pg. 78:22-24; 79:1-4.) Plaintiff also testified that he was "not allowed to purchase anything from the vendings [*sic*]" during his visits. (*Id.* at pg. 79:8-9.)

During his deposition, defense counsel asked Plaintiff, "what is the harm or injury that you allege in your complaint?" (*Id.* at pg. 84:20-21.) In response, Plaintiff stated, "[b]eing unjustly placed in segregation, being denied my property, being denied my contact visits." (*Id.* at pg. 84:22-24.) Defense counsel then asked, "[s]o it's the discipline?" (*Id.* at pg. 85:1.) Plaintiff responded "[y]es." (*Id.* at pg. 85:2.) When asked if he had any physical injury, Plaintiff responded "no." (*Id.* at pg. 85:3-5.) When asked if he had any mental health injury, Plaintiff responded as follows:

> I mean, I've – since then I have been – I been on mental health caseload. I've been – like I said, it's been a continuous thing. Like, it's something that I'm still dealing with right now and to this day. Like, I'm still being retaliated against. I'm still being harassed in different forms. I'm still being denied access to the courts. I still haven't been returned none of my property that I been missing since I got to this facility. I'm actually steady losing property. Every time – every time I get moved or placed in segregation I'm still getting tickets fabricated against me.

(*Id.* at pg. 85:10-23.)

Plaintiff went on to testify that:

> I don't know if it's causing me depression, anxiety, or whatever the case may be, but I know that I'm being affected by it because, you know, it's been a stressful situation for these past few years.

(*Id.* at pg. 86:19-23.)

***Plaintiff's July 23, 2021, Grievance and the Expungement of the Disciplinary Report***

On July 23, 2021, Plaintiff filed a grievance in connection with the Disciplinary Report, wherein he described his investigative status, disciplinary report, and the Adjustment Committee findings. (*Id.* at ¶ 25.) In this grievance, Plaintiff also asserted that he was not guilty of either DR 203 or 601, and described the sender of the letter, Latrisha Box, as "this unknown person from the FREE WORLD." (*Id.*)

On August 23, 2021, a grievance officer responded to Plaintiff's grievance, reviewing the

disciplinary report and Adjustment Committee summary, and stated that "this Grievance Officer is reasonably satisfied Box M47671 is guilty of the 203 Drugs & Drug Paraphernalia (601 Attempt)." (*Id.* at ¶ 25.) The grievance response also indicates that "Box was provided with an Adjustment Committee Hearing and was subsequently found guilty of the charge listed above. The discipline received is within the guidelines set forth in DR 504A- Administration of Discipline." (*Id.*) The grievance response also indicates that "[b]ased upon a total review of all available information and a compliance check of procedural due process safeguards in accordance with Department Rule 504, this Grievance Officer recommends the grievance be denied." (*Id.*)

On August 23, 2021, a delegee of Wilks, so indicated by parenthetical initials, provided the Chief Administrative Officer's Response, concurring with the Grievance Officer's Response in denying Plaintiff's grievance. (*Id.* at ¶ 30.)

On September 9, 2021, the Administrative Review Board affirmed Plaintiff's appeal of his grievance, and without stating the basis for its finding, found that the disciplinary charge against him to not be fully substantiated, ordering the report and summary to be expunged. (*Id.* at ¶ 28.)

On October 1, 2021, the disciplinary report was expunged by order of the ARB. (*Id.* at ¶ 31.)

## IV. Analysis

### A. Plaintiff's Due Process Claim

Defendants argue that they are entitled to summary judgment because Plaintiff's right to due process was never triggered. (Dkt. 81-3 at pgs. 12-13.) They also argue that Plaintiff was afforded constitutionally sufficient protections. (*Id.* at pgs. 13-15.) The Court agrees on both counts.

To begin, the mere placement of an inmate in disciplinary segregation does not implicate a due process liberty interest. *Sandin v. Conner*, 515 U.S. 472, 484-86 (1995). Instead, the conditions potentially rise to the level of a due process violation if they pose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Id.* at 484; *see also Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009). Accordingly, "the right to litigate disciplinary confinements has become vanishingly small." *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997).

When determining whether conditions of segregation rise to the level of an "atypical and significant hardship," the Court must consider "the combined import of the duration of the segregative confinement and the conditions endured by the prisoner during that period." *Marion*, 559 F.3d at 697-98.

Here, as a result of the disciplinary action initiated against him in connection with the June 15, 2021, letter, Plaintiff spent **a total of 45 days** in segregation (which includes the time he spent in investigative status and in disciplinary segregation). Following the disciplinary hearing, Plaintiff also received a **disciplinary transfer, three months commissary restriction, and six months contact visit restrictions**.[6] However, none of this implicates a liberty interest. *See e.g., Meachum v. Fano*, 427 U.S. 215 (1976) (transfer from medium-security to maximum-security

[6] In his amended complaint, Plaintiff alleged that, while in segregative confinement, he was denied access to prison programs ("religious or educational programing"), dayroom, "walks to chow," and barber shop visits. (*See* Dkt. 15 at pg. 8.) He alleged further that he was permitted only three showers a week, "phones once a week," had no access to his personal property, and was "denied or delayed" medical care. (*See id.*) However, at summary judgment, Plaintiff has not fleshed-out these allegations or provided any further detail about them, which is problematic because summary judgment is the "put up or shut up moment in a lawsuit[.]" *See Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010). The Court notes further that there is also no evidence in the summary judgment record establishing that Plaintiff suffered from any particular medical issue or ailment (for which he required medical attention). Notably, Plaintiff testified during his deposition that he *did not* suffer any physical injury (*see* Dkt. 81-6 at pg. 85:3-5), and there is nothing to suggest that Plaintiff suffered any significant mental harm (*see id.* at pg. 85:10-23; 86:19-23) from the events complained of in this suit.

prison did not implicate a liberty interest); *Marion*, 559 F.3d at 698 (six months of segregation, standing alone, would not trigger due process rights); *Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) (no liberty interest when inmate spent six months in segregation behind a steel door with a confrontational cellmate and had only weekly access to shower and prison yard); *Lekas v. Briley*, 405 F.3d 602, 608-09 (7th Cir. 2005) (concluding that 90 days in disciplinary segregation with "inability to participate in educational programs, inability to participate in work programs . . ., loss of contact visits, loss of telephone use, . . . inability to attend church, no visits from clergy, drastic reduction in exercise privileges, . . . drastic reduction in the number and nature of personal items that prisoners are allowed to have in their possession, and no access or very little access to audio/visual items" did not implicate protected liberty interest); *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005) ("A demotion to grade-C status for an Illinois prisoner – which means that the prisoner loses commissary and telephone privileges – does not implicate a liberty interest."); *Thomas v. Ramos*, 130 F.3d 754, 762 n.8 (7th Cir. 1997) (holding that a 70-day segregation, grade demotion, and loss of commissary privileges did not trigger procedural due process rights); *Montanez v. Butler*, No. 14-CV-754-MJR-SCW, 2017 WL 1425943, at *5 (S.D. Ill. Apr. 21, 2017) ("Punishments such as a demotion in grade or commissary restriction do not amount to a constitutional deprivation."); *see also Lumbert v. Ill. Dep't of Corr.*, 827 F.2d 257, 260 (7th Cir. 1987) (noting that the necessities of life are provided for prisoners and that they need not be provided access to the commissary).

The Court observes that in his summary judgment response (specifically, his Declaration), Plaintiff complains, for the first time, that he was *also exposed* to unsanitary living conditions while confined to "restrictive housing." (Dkt. 94 at pgs. 2-3.) Plaintiff describes, for instance,

being "placed in a cell with no electrical outlets during the hot summer months," not having access to his fan, and receiving "only . . . 1 soap, 1 toothpaste, no toothbrush, no deodorant, 1 mattress, no bedroll[.]" (*Id.*) He also states that his cell in restrictive housing "had . . . dried mace and unknown substance covering the walls, sink, toilet, mattress and floor[,]" and he indicates that he was not provided with "cleaning solutions[.]" (*Id.*)

At the outset, the Court notes that the amended complaint did not contain any allegations about unsanitary living conditions in segregation. Additionally, Plaintiff did not testify about any unsanitary living conditions during his deposition, *even after he was specifically asked* by defense counsel if he had testified about "everything [he] remember[ed] about the allegations in the complaint." (Dkt. 81-6 at pg. 103:11-13.) Plaintiff explicitly answered "yes" to this question. (*Id.* at pg. 103:14.) Further still, Plaintiff did not mention any unsanitary living conditions in his original response to Defendants' summary judgment motion.[7] (*See* Dkts. 86, 87.) For these reasons, the Court is dubious of Plaintiff's late-stage statements in his Declaration, and finds it unlikely that Plaintiff simply failed to mention the unsanitary living conditions at an earlier stage of this case.

In any event, Plaintiff's statements in his Declaration about the unsanitary living conditions -- which are listed in vague, unadorned terms -- do not suggest he was deprived of a liberty interest. His bald, conclusory statements give no indication or clues as to the nature and extent of the complained-of unsanitary conditions. As noted above, summary judgment is the "put up or shut up moment in a lawsuit[.]" *See Siegel*, 612 F.3d at 937. If Plaintiff was subjected to unsanitary

[7] As noted at fn. 1 above, Plaintiff sought and was granted permission to file a "corrected" response to Defendants' summary judgment motion.

living conditions during or at times during his segregative confinement, now was the time to introduce evidence related to those conditions.

Moreover, as a substantive matter, Courts have repeatedly found that the type of unsanitary cell conditions Plaintiff identifies in his Declaration -- and arguably worse -- for extended periods of time were insufficient to create a protected liberty interest. *See e.g., Sanchez v. Walker*, No. 09 C 2289, 2010 WL 5313815, at *6, 7 (N.D. Ill. Dec. 17, 2010) (examining conditions of inmate's six-month stay in Stateville's F House, which allegedly included prevalent vermin, infrequent trash removal, a stained toilet, and insufficient cleaning supplies, and finding that the conditions were "not so harsh or atypical of the ordinary incidents of prison life to give rise to constitutional due process concerns with [plaintiff's] disciplinary hearing."); *Coleman v. Baldwin*, No. 15 C 5596, 2016 WL 537970, at *4 (N.D. Ill. Feb. 11, 2016) (holding that six months in segregation with insects, mice, broken windows, shower restrictions, as well as denial of wheelchair and walking cane did not implicate plaintiff's liberty interests); *Williams v. Sanders*, No. 10-1131, 2010 WL 4687840, at *2 (C.D. Ill. Nov. 4, 2010) ("Transferring a prisoner from the general population to segregation unit" with "noisy, unsanitary cells" did "not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest," and is "'within the expected parameters of the sentence imposed by a court of law.'"); *cf. McKinley v. Atchison*, No. 3:16-CV-661-NJR-MAB, 2019 WL 4744839, at *7 (S.D. Ill. Sept. 30, 2019) (finding conditions including mice and cockroach infestation, cracked window, no heat, no hot water for months on end, and no cleaning supplies implicated plaintiff's due process rights where conditions lasted more than three years).

Accordingly, the Court finds that, on this record, Plaintiff's right to due process was not triggered. Even if it was triggered (a finding which this Court does not make), Plaintiff was afforded constitutionally sufficient protections under *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974).

To be sure, the procedural protections outlined in *Wolff* provide safeguards against arbitrary actions by correctional facility staff. Due process in a prison disciplinary proceeding requires three key components: (1) advanced written notice of the disciplinary charge; (2) the opportunity to call witnesses and present evidence; and (3) a written statement by the fact-finders of their decision that includes the evidence relied upon and the basis for their decision. *Lucas v. Montgomery*, 583 F.3d 1028, 1030 (7th Cir. 2009) (citing *Wolff*, 418 U.S. at 563-66). In addition, procedural due process requires that the findings of the disciplinary tribunal must be supported by some evidence in the record. *Superintendent, Mass. Correctional Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985). Even a meager amount of supporting evidence is sufficient to satisfy this inquiry. *Scruggs v. Jordan*, 485 F.3d 934, 941 (7th Cir. 2007). Once the court has determined that the evidence is reliable, the inquiry ends, and the court should not look further to see whether other evidence in the record may have suggested an opposite conclusion. *Viens v. Daniels*, 871 F.2d 1328, 1335 (7th Cir. 1989).

Here, Plaintiff was issued a disciplinary ticket on July 8, 2021, which identified the charge against him and contained information advising Plaintiff of his right to call witnesses and present evidence. Plaintiff appeared before the Adjustment Committee a few days later on July 13, 2021. A disciplinary hearing was conducted outside of Plaintiff's cell, during which time Plaintiff presented his exculpatory evidence. The Adjustment Committee's Final Report shows that

Plaintiff was found guilty of a violation of DR504:203 (attempt), and that the decision was based on the following evidence:

> Disciplinary Report from Officer Allen Internal Affairs stating that Box M47671 was observed receiving a letter addressed to Martel Box M47671 through Dixon CC Institutional mail. The letter was visibly stained and had a strong odor emitting from the envelope. Staff utilized a Narcotics Analysis Reagent Kit II on a portion of the incoming mail which yielded a presumptive positive result for the presence of synthetic cannabinoids. Committee review of the referenced testing results provided by Internal Affairs showing and confirming the positive test result. Committee review of envelope which was observed to be addressed to Martell Box M47671. Reporting staff's positive ID of Box M47671 using Institutional Graphics database.

(Dkt. 81-2 at ¶ 19.) Plaintiff made no oral statement during the hearing, provided no witnesses at the hearing, and did not -- and does not -- dispute that a letter addressed to him, containing an intoxicant or marijuana, was received at Dixon.[8]

Despite the above (which shows that the *Wolff* factors were met and that the finding of the Adjustment Committee was indeed based on "some evidence"), Plaintiff maintains that he was not provided with procedural due process.

In his Declaration, Plaintiff points out that the hearing was conducted in a hallway (not a private area). (*See* Dkt. 94 at pg. 4.) He also explains, in his Declaration and his memorandum of law, that he never "personally" received the letter in question (rather, the facility received the letter in question), and that the facility should have returned the letter to the sender when it suspected it contained drugs. (*See* Dkt. 94 at pg. 4; 96 at pgs. 1-6.) It is clear that Plaintiff is dissatisfied with the manner in which events unfolded in connection with the June 15, 2021, letter, but these

---

[8] Again, the Court reiterates that Plaintiff admitted all of Defendants' facts in this case, except for two (neither of which are material to the due process analysis). It may be that Plaintiff is dissatisfied with Dixon's internal procedures (or the manner in which IDOC defines certain rule violations), but those things are unrelated to his constitutional due process rights, as discussed below.

contentions do not address or call into question the *Wolff* factors (which, as discussed above, were met here) or the evidence supporting the final decision of the Adjustment Committee.

Relatedly, in his Declaration and memorandum of law, Plaintiff also takes issue with what he describes as the quality or accuracy of the investigation that was conducted in connection with the June 15, 2021, letter. (*See* Dkts. 94, 96.) Plaintiff maintains that the Adjustment Committee and/or the individual Defendants should have conducted an "independent investigation" of the June 15, 2021, letter. (*See id.*) Plaintiff emphasizes that at the time he appeared before the Adjustment Committee, "[t]here was only a presumptive positive from test kit known to produce false positives." (Dkt. 96 at pg. 4.) He also emphasizes that he did not know the sender of the letter. (*Id.*) But, again, these contentions does not speak to the procedural safeguards under *Wolff*, and Plaintiff does not have a constitutional right to an investigation, much less one of any particular quality. *See Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015). Along these lines, "[t]he fact that the outcome [of the disciplinary proceeding] was eventually overturned does not mean that the hearing failed to satisfy minimal procedural requirements." *Lagerstrom v. Kingston*, 463 F.3d 621, 624-25 (7th Cir. 2006).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's due process claim. The Court need not address Defendants' qualified immunity argument (Dkt. 81-3 at pg. 15) because there is no evidence their conduct was constitutionally deficient.

## V. Conclusion

For the reasons stated above, the Court grants Defendants' motion for summary judgment (Dkt. 81). Final judgment shall enter.

If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Id.* If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

**IT IS SO ORDERED.**

Date: 9/24/2026

Entered: ______________________________
SHARON JOHNSON COLEMAN
United States District Judge